AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

___ FILED   ___ LODGED
___ RECEIVED

AUG 29 2019

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. MJ19-5165
2511 E. 18th Street, Vancouver, Washington, as more )
fully described in Attachment A )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
2511 E. 18th Street, Vancouver, Washington, as more fully described in Attachments A, incorported herein by reference.

located in the ____Western____ District of ____Washington____, there is now concealed *(identify the person or describe the property to be seized)*: DWC

See Attachments B-2, B-4, B-5, B-6, and B-1 for List of items to be seized, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Manufacturing, distribution and possession with intent to distribute marijuana, |
| 18 U.S.C. § 1956 | money laundering |

The application is based on these facts:
☑ See Affidavit of HSI Special Agent Chad Lindsly.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

*Applicant's signature*

Chad Lindsly, HSI Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 08/29/2019

*Judge's signature*

City and state: Tacoma, Washington   U.S. Magistrate Judge David W. Christel
*Printed name and title*

2019R00804

County of Pierce           )
                           )    ss:    AFFIDAVIT OF CHAD LINDSLY
State of Washington        )

**Affidavit in Support of an Application**
**Under Rule 41 for a Search Warrant**

I, Chad Lindsly, being duly sworn, do hereby depose and state as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent by Homeland Security Investigations (HSI) since December of 2010. I am currently assigned to the Drug Enforcement Administration Portland District Office Group D-51 as a Task Force Agent and have been since approximately February 2017. Previously, I was assigned to the ICE/HSI Office in Calexico, California, where I worked for over six years. My formal law enforcement training includes successfully completing the 23-week HSI basic training course at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Since then, I have participated in dozens of drug investigations involving controlled purchase operations, vehicle tracking, cell phone geo-location techniques, cell-site simulators, and pen register/trap and trace orders. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillance, and utilized electronic and video surveillance. I have been the affiant on over 100 search warrants. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking.

2. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **Premises 1** located in the Western District of Washington described as the following:

   a. **Premises 1**: 2511 E 18th Street, Vancouver, Washington 98661, identified

as the primary residence of Judah Harryman. This location is described in Attachment A as incorporated herein;

As described in Attachments A hereto, for evidence, contraband, fruits, and instrumentalities of violations of Title 21, U.S.C., Section 841(a)(1) and 846, Possession with the Intent to Distribute Methamphetamine and Conspiracy to Possess with the Intent to Distribute Methamphetamine, Title 21, United States Code, Section 843(b), Use of a Communication Facility to Distribute Controlled Substances, and Title 21, United States Code, Section 856 – Maintaining Drug-Involved Premises. As set forth below, I have probable cause to believe that such property and items, as described in Attachments B hereto, including the digital device described in Attachment B attached hereto, is currently located at **Premises 1**. There is also probable cause to believe that such property and items, described in Attachments B, will constitute evidence of these Subject Offenses and will assist law enforcement in its investigation of individuals engaged in the commission of these offenses.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## II. APPLICABLE LAW

4. Title 21, United States Code, Sections 841(a)(1) and 846, Possession with the Intent to Distribute and Conspiracy to Possess with the Intent to Distribute Methamphetamine makes it unlawful to possess with the intent to distribute methamphetamine, a Schedule II controlled substances under federal law, and to conspire to do so. Title 21, United States Code, Section 843(b) makes it unlawful to use a

**Page 2 – Affidavit of Chad Lindsly - 2**

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253-428-3800

communication facility, such as a cellular telephone, to distribute controlled substances such as methamphetamine. Finally, Title 21, United States Code, Section 856 makes it unlawful to maintain a premise for the purpose of manufacturing distributing or using any controlled substance.

### III. STATEMENT OF PROBABLE CAUSE[1]

5. In April 2019, the Drug Enforcement Administration Portland District Office Group D-51 (DEA D-51) began investigating a Drug Trafficking Organization (DTO) that is responsible for coordinating the smuggling of distributable amounts of methamphetamine and heroin from Mexico into the United States destined for the greater Portland, Oregon area. Based on information gained through various investigative techniques, including surveillance, subpoenas, call-detail record analysis, subscriber information on relevant phones, prior drug-related investigations, court-authorized searches, methamphetamine and heroin seizures, interviews with co-conspirators, multiple court-authorized wire and electronic intercepts over several cellular phones, I believe that the DTO is responsible for smuggling methamphetamine and heroin from

---

[1] Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. *IP address*. The Internet Protocol address (or simply "IP address") is a unique numeric address used by digital devices on the Internet. Every digital device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that digital device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some digital devices have static—that is, long-term—IP addresses, while other digital devices have dynamic—that is, frequently changed—IP addresses.

    b. *Internet*. The Internet is a global network of digital devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    c. *Storage medium*. A storage medium is any physical object upon which data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Mexico into the United States destined for the greater Portland, Oregon area, for distribution by members of the DTO and others to their drug customers. To-date, DEA D-51 has seized over 300 pounds of methamphetamine, 16 pounds of heroin, and $200,000 U.S. dollars directly attributable to members of the DTO.

6. On August 14, 2019, following this investigation, a federal grand jury returned a five-count indictment against 13 defendants, finding probable cause to believe that these defendants, among others, had engaged in a drug trafficking conspiracy from April 2019 until August 2019, and subsequently authorized the issuance of arrest warrants for multiple defendants, including Cooperating Defendant (CD). The investigation revealed that between the time period of June 25, 2019 to August 3, 2019, the CD had purchased greater than 20 ounces of methamphetamine and one ounce of heroin for redistribution from a related co-defendant.

7. On August 27, 2019, several court-authorized search warrants were issued in the District of Oregon and the Western District of Washington for the residences of several of the defendants. As detailed below, CD was arrested on August 28, 2019 as part of a coordinated enforcement action that took place in the District of Oregon and the Western District of Washington as part of the on-going investigation detailed herein.

8. On August 28, 2019, I arrested the CD pursuant to an active federal arrest warrant issued out of the District of Oregon. The CD was initially detained by state and local police after a concerned citizen called 9-1-1 after they had observed the CD in an apartment complex where police were earlier looking for the CD earlier in the day. The CD was detained by state and local law enforcement and I responded shortly thereafter.

9. Upon arriving, I learned from the state and local law enforcement that the CD also had a vehicle associated to him/her ("CD's Vehicle"), which was parked immediately next to us. I recognized the CD's Vehicle because I had previously identified it in the current investigation as being the primary vehicle for the CD. I informed the CD that he/she was under arrest pursuant to a federal arrest warrant issued out of the District of Oregon for several drug-related crimes. I asked the CD if the CD's

Page 4 – Affidavit of Chad Lindsly - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253-428-3800

Vehicle was his/hers, to which the CD stated that it was, that there were drugs in the vehicle, and that I could search the vehicle.

10. During a subsequent search of the CD's vehicle I recovered several ounces of methamphetamine, personal use amounts of heroin, a digital scale, small Ziploc style bags that I recognize as bags commonly used for distribution of controlled substances, drug paraphernalia, and approximately $3,000. I noted that the crystal methamphetamine was approximately three large shards weighing approximately one ounce per shard, which I recognize as being consistent with high purity and quality methamphetamine. A photograph of the items seized look like this:

11. During a post-arrest interview, the CD stated that the CD wanted to assist law enforcement. The CD has been made no promises and assurances but is providing information in hopes of receiving a reduced sentence on current charges. The CD has a lengthy criminal history including crimes over the span of 30 years for narcotics-related violations, vehicle-related offenses, and bail jumping. The CD does not have any arrests for providing false information to law enforcement, forgery, or similar offenses that would undermine his/her veracity. The CD has a history of drug use. I have intentionally

omitted some identifying information to help protect the identity of the CD. I believe the CD's information is credible to the extent it has been corroborated by my independent investigation.

12. The CD told me that the CD had purchased the methamphetamine and heroin seized in the vehicle, as depicted in the photograph above, from a drug dealer named "Judah Harryman" within the last seven days, later identified as Judah Harryman, DOB: XX/XX/1977. To help protect the identity of CD and not reveal CD's relationship with Harryman, I am intentionally not including specific details about the CD's relationship with Harryman, including the specific date that the CD purchased the methamphetamine and heroin from Harryman.

13. The CD stated that the CD has purchased distributable amounts of methamphetamine (at least 50 grams of methamphetamine on each occasion) from Harryman on at least three occasions over the last month. Based upon my training and experience, I know that 50 grams of methamphetamine is consistent with distribution quantities of this drug, not personal use. On each drug transaction the CD stated that he/she went into **Premises 1** to conduct the drug transaction. On each occasion, the CD purchased distributable amounts of methamphetamine and observed large quantities of methamphetamine (approximately one pound) and heroin (roughly the size of a baseball, which, based upon my training and experience, would be consistent with several ounces of heroin) inside **Premises 1** in various locations. The CD recognized the controlled substances as methamphetamine and heroin based on the CD's 30-year history and familiarity with methamphetamine and heroin, including being able to identify the controlled substances by sight. The CD gave me detailed descriptions of the quantities of drugs the CD observed and where in Harryman's residence (i.e., **Premises 1**) he/she observed them. Again, to shield CD from identification, I am not including those specific details that might unintentionally disclose the CD's identity. I also am not disclosing the frequency or dates of when the CD purported to have visited Harryman's residence (i.e., **Premises 1**).

14. The CD stated that normally he/she would contact Harryman via cellular phone to purchase methamphetamine and heroin. The CD stated that during these communications the CD and Harryman never explicitly discussed quantities and/or types of drugs and would just agree to meet at **Premises 1**. The CD stated that he/she had Harryman's contact number saved in his/her cellular phone. The CD identified the contact saved as "Judah H" with the corresponding cellular phone number (360) 721-4602 ("Harryman's Phone"). The CD stated that frequently he/she deleted the text messages on CD's Phone to elude detection by law enforcement but believed that the communications from the last drug purchase were still located on CD's Phone. I have reviewed the text message and call detail records on CD's Phone with Harryman's Phone that revealed communications consistent with the statements by the CD regarding meeting with Harryman, including at least two occasions within the last two weeks. Again, to shield CD from identification, I am not including those specific details about the dates and times of the communications that might unintentionally identify the CD's identity.

15. The CD stated that he/she would take me to Harryman's residence (i.e., **Premises 1**) and point it out. The CD, another law enforcement officer, and I then began driving at the direction of the CD. Over the course of the next 20 minutes, the CD provided specific driving instructions to **Premises 1**. Prior to arriving, the CD provided a detailed description of **Premises 1**, including several vehicles known by the CD to have been driven by and/or observed at **Premises 1**. Shortly thereafter, I arrived at **Premises 1** and the CD positively identified **Premises 1** as the residence of Harryman. I noted that the physical description of the property given by the CD was consistent with **Premises 1**. I also observed several vehicles parked in the driveway previously described by the CD prior to arriving.

16. I then conducted a search of the social media website Facebook.com for "Judah Harryman" and located the Facebook account named "Judah Harryman," which was located at www.facebook.com/JudahHarryman ("Harryman's Facebook"). I pulled

up the main profile picture Harryman's Facebook. The CD positively identified the individual in the photograph as Harryman and the individual the CD purchases methamphetamine and heroin from at **Premises 1**.

### IV.   POSITIVE IDENTIFICATION OF HARRYMAN

17.   On August 29, 2019, I conducted record checks in the Washington Department of Motor Vehicles for Harryman's drivers license. I have reviewed the driver's license photograph associated to Harryman's driver's license which listed **Premises 1** as the address of Harryman. I also reviewed Harryman's driver's license photograph and the photograph I showed the CD from Harryman's Facebook. I have concluded that Harryman is the same individual. A side-by-side of the two images are as follows:



18.   I conducted record checks and reviewed Harryman's criminal history. Harryman has a criminal record, including a 2006 Class C felony for failure to register as a sex offender and a gross misdemeanor for assault 4 (domestic violence); a 1997 felony conviction for possession of amphetamine; 1995 misdemeanor convictions for drug paraphernalia and theft; and a conviction as a juvenile that required Harryman register as a sex offender up until 2009.

### V.   KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

19.   Based upon my training and experience, and conversations with, and

training from, other officers and agents involved in drug investigations, I know the following:

a. Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes and vehicles.

b. Traffickers of controlled substances commonly maintain records such as telephone numbers of their suppliers, customers and associates in the trafficking organization and it is common to find drug traffickers keeping records of said associates in cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement and it is common for traffickers to use more than one cellular telephone at any one time. Traffickers often retain previously-used cellular telephones for a period of time after they discontinued using the telephones.

c. Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences and vehicles. This evidence often includes more than contraband and paraphernalia and includes financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes.

d. Traffickers frequently maintain items necessary for weighing, packaging and cutting drugs for distribution. This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

e. Traffickers frequently maintain records, books, notes, ledgers, and other papers relating to the transportation and distribution of controlled substances in locations convenient to them, such as their residences and vehicles.

f. Traffickers often maintain weapons, including guns and ammunition, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

g. Traffickers often have false identification documents and identification documents in the names of others.

h. Drug trafficking is a cash business and in order to escape notice from authorities for using unexplained income, or hide excessive cash from illegal activities, traffickers either keep large quantities of cash at home or other secure locations, or convert cash into other valuable assets, such as jewelry, monetary instruments, or other negotiable forms of wealth. Records of such conversions are often stored where a trafficker lives.

i. Based on my training and experience, I believe it is common for drug traffickers to maintain ready access to their drugs so as to be able to sell to customers on short notice. I know it is also common for drug traffickers to maintain other items used in the distribution of drugs, such as scales and packaging materials and cutting/diluting agents.

j. Based on my training and experience, I know that it is also common for drug traffickers to maintain other items of evidentiary value, including cell phones, drug ledgers, firearms, currency and other items, such as documents related to bank accounts, vehicle and/or property ownership or property rentals including safe deposit boxes and storage units. These items are often kept in residences and vehicles used by the drug traffickers.

k. Based on my training and experience, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or maintained on computers or other electronic devices. It is also my experience that these traffickers tend

to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. It is also my training and experience that where criminal activity is long-term or ongoing, equipment used to commit the crime, and records of the crime, will be kept for some period of time.

20. As described above and in Attachments B, this application seeks permission to search for records that might be found on **Premises 1**, in whatever form they are found, related to violations of Title 21, U.S.C., Section 841(a)(1) and 846, Possession with the Intent to Distribute Methamphetamine and Conspiracy to Possess with the Intent to Distribute Methamphetamine, Title 21, United States Code, Section 843(b), Use of a Communication Facility to Distribute Controlled Substances, and Title 21, United States Code, Section 856 – Maintaining Drug-Involved Premises. One form in which the records will likely be found is data stored on a computer's hard drive, on other storage media, or other digital devices, including cell phones (hereinafter collectively referred to as digital devices). Thus, the warrant applied for would authorize the seizure of electronic storage media.

21. There is probable cause to believe, and I do believe, that records will be stored on a digital device because, based on my knowledge, training, and experience, I know that drug traffickers/distributors often communicate with their associates using telephones, cellular telephones, pre-paid telephones, radios, and pagers. I am also aware that drug traffickers/ distributors often change telephones, cellular telephones and pagers as a means to evade detection by law enforcement. Furthermore, I have learned in my training that narcotic traffickers/distributors often will utilize several cellular phones, including prepaid phones as a method to compartmentalize their drug trafficking/bulk cash activities and as a means to evade detection by law enforcement. Furthermore, I have learned that drug traffickers and distributors often create fictitious names and addresses on their personal cell phones as well to avoid detection by law enforcement.

a. Based on my training and experience, I know that it is common for drug traffickers to use their cellular phones to distribute drugs. Thus, I believe that digital devices were used to generate, store, print and/or communicate in furtherance of Harryman's drug trafficking activities. Thus, there is reason to believe that there are digital devices currently located on **Premises 1** that communicated with drug customers or co-conspirators.

## VI. CONCLUSION

22. Based on my training, experience, and the investigation to date, I believe that the Judah Harryman is involved in the distribution of methamphetamine and heroin that evidence of the Subject Offenses will be found in a search of **Premises 1**. I also believe that a search of **Premises 1** will result in acquisition of evidence that can be obtained from cellular phones used by Judah Harryman and other co-conspirators in furtherance of the Subject Offenses.

23. Based on the foregoing, I have probable cause to believe, and I do believe, that Judah Harryman committed offenses in violation of Title 21, U.S.C., Section 841(a)(1) and 846, Possession with the Intent to Distribute Methamphetamine and Conspiracy to Possess with the Intent to Distribute Methamphetamine, Title 21, United States Code, Section 843(b), Use of a Communication Facility to Distribute Controlled Substances, Title 21, and United States Code, Section 856 – Maintaining Drug-Involved Premises, and that evidence of those Subject Offenses, as more fully described in Attachments B, are presently contained at **Premises 1** located in the Western District of Washington, which is more fully described above and in Attachments A hereto. I therefore request that the Court issue a warrant authorizing a search of **Premises 1** described in Attachments A for the items listed in Attachments B.

24. Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorneys (AUSA) Paul T. Maloney and Karyn S. Johnson, who advised me that in their opinion the affidavit and application are legally and factually sufficient to establish


probable cause to support the issuance of the requested warrant.

## VII. REQUEST FOR SEALING

25. It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may cause flight from prosecution, cause destruction of or tampering with evidence, or otherwise seriously jeopardize an investigation. Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

_____
CHAD LINDSLY
Special Agent, HSI

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 29th day of August 2019.

_____
DAVID W. CHRISTEL
United States Magistrate Judge

**ATTACHMENT A**

**Property to Be Searched**

The property to be searched is 2511 E 18th Street, Vancouver, Washington 98661 ("**Premises 1**"), further described as a single detached residence located as the third house on the south side of E 18th Street west of the intersection of E 18th Street and Z Street. The residence is cream in color with brown trim with a detached garage on the east side of the property that the driveway runs into. The residence has a shrub tree line that runs the length of the front yard from east to west. The residence is clearly marked with "2511" in black letters on the mailbox. Below are photographs further detailing **Premises 1**:





## ATTACHMENT B

### Items to Be Seized

The items to be searched for, seized, and examined, are those items on the premises located at 2511 E 18th Street, Vancouver, Washington 98661 ("**Premises 1**"), identified as the primary residence of Judah Harryman; referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of violations of Title 21, U.S.C., Section 841(a)(1) and 846, Possession with the Intent to Distribute Methamphetamine and Conspiracy to Possess with the Intent to Distribute Methamphetamine, Title 21, United States Code, Section 843(b), Use of a Communication Facility to Distribute Controlled Substances, and Title 21, United States Code, Section 856 – Maintaining Drug-Involved Premises. The items to be seized cover the period of January 1, 2019, through the date of the execution of the search warrant.

1. The items referenced above to be searched for, seized, and examined are as follows:

    a. Controlled substances, including methamphetamine and heroin, held in violation of 21 U.S.C. Sections 841(a)(1) and 846;

    b. Firearms and other dangerous weapons and ammunition held in violation of law;

    c. Financial profits, proceeds and instrumentalities of trafficking in narcotics, including U.S. Currency and other items of value purchased/acquired between January 1, 2019, and the present;

    d. Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutants such as inositol, vitamin B12, etc.;

    e. Books, records, receipts, notes, ledgers, and other documents relating to the manufacture and distribution of controlled substances;

communications between members of the conspiracy; tools, devices, money counters, and other items commonly used to count, package, and store currency;

  f. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture and distribution of controlled substances;

  g. Financial records relating to controlled substances income and expenditures of money and wealth, to wit: transaction receipts, money orders, wire transfer records, cashier's checks and receipts, account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc., purchased/acquired between January 1, 2019, and the present;

  h. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises, including but not limited to mail, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

  i. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel purchased/acquired/dated between January 1, 2019, and the present;

  j. The device with the associated cellular phone (360) 721-4602 with NFI ("Harryman's Phone") used by Judah Harryman for data that constitutes evidence or the instrumentality of drug dealing and conspiracy to do the same. All cellular telephones, computers and other electronic devices capable of storing data that constitutes evidence or the instrumentality of drug dealing and conspiracy to

do the same will be seized only and will be searched pursuant to subsequent warrants issued in the District of Oregon in accordance with the District of Oregon search protocols;

      k.     Latent prints and identifying material from items at the premises, including the fingerprints of the person located at **Premises 1** identified as Judah Harryman;

    2.     As used in this attachment, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.